CASE 86.—ACTION BY T. M. GILMORE & CO. AGAINST W. B.
SAMUELS & CO. TO RECOVER BROKERAGE FEES.
December 8, 1909.

## Gilmore & Co. v. Samuels & Co.

Appeal from Nelson Circuit Court.

SAMUEL E. JONES, Circuit Judge.

Judgment for defendant, plaintiff appeals.—Reversed.

1.  Brokers—Agreement for Compensation—Consideration.—The
    undertaking by a broker to effect a sale of property is a con-
    sideration sufficient to support the contract for the payment
    of commissions thereof.
2.  Corporations—Authority of Officers—Sale of Manufactured
    Product.—A corporation president expressly authorized by the
    board of directors "to sign the corporate name to all papers
    pertaining to the business of" the corporation has authority
    to contract with a broker for the sale of the manufactured
    product on hand, and to be manufactured during a period of
    five years.
3.  Contracts—Construction—Entire or Severable Contracts.—In
    determining whether a contract is to be treated as an entirety
    or as severable, the intention of the parties must control, and
    this intention is to be determined by the terms of the con-
    tract itself.
4.  Contracts—Construction—Entire or Severable Contract.—A
    contract between plaintiff, a broker, and defendant, a distill-
    ing company, authorized plaintiff to sell for a specified commis-
    sion defendant's manufactured product on hand and to be
    manufactured during a period of 5 years, and provided that
    the purchaser of the product should have an option to pur-
    chase the distillery at the end of five years, or, if the con-
    tract be extended for an additional five years, as therein pro-
    vided, the purchaser should have an option to purchase the
    distillery at the end of the second five years, plaintiff to re-
    ceive a specified commission for selling the distillery in
    addition to that for selling the product. Held, that the con-

tract was severable, and defendant's officer who made it hav-
ing authority to sell the product, that portion of the contract
is enforcable, even if that relating to the sale of the distil-
lery was invalid for want of authority to make it.

5.  Contracts—Validity—Mental Capacity.—To render a contract
invalid for mental incapacity of a party thereto, it is not
enough to show that such party was at times, by the use of
drugs, by disease, or other cause, lacking in mentality, but
the evidence of defective mind must relate to the immediate
time of making the contract.

6.  Corporations—Contracts—Validity—Mental Capacity of Officer
—Evidence.—Evidence held to show that a corporate officer in
making a corporate contract had sufficient mental capacity to
do so, and fully understood the transaction.

7.  Corporations—Contracts—Validity.—A corporate contract can-
not be set aside for mental incapacity of the president who
executed it, where another corporate officer who had the active
management and control of the concern's affairs assisted in,
and advised the making of the contract.

JOHN S. KELLEY, JOHN A. FULTON AND R. C. CHERRY,
for appellant.

NAT W. HALSTEAD, D. A. McCANDLESS AND E.  E.  Mc-
KAY for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Re-
versing.

This litigation grows out of an attempt on the part
of T. M. Gilmore & Co. to recover of W. B. Samuels
& Co. brokerage fees for the sale of 3,266 barrels of
whisky at 50 cents per barrel.  The plaintiff, T. M.
Gilmore & Co., is a corporation engaged in the whisky
brokerage business in the city of Louisville.  The de-
fendant, W. B. Samuels & Co., is a corporation own-
ing and operating a distillery in Nelson county, Ky.
On the 29th day of November, 1906, T. M. Gilmore &
Co. procured from  W. B. Samuels & Co. the follow-
ing writing: "Samuels, Ky., Nov. 29, 1906.  This
writing witnesseth that W. B. Samuels & Co., incor-
porated, of Nelson Co., state of Kentucky, have this

day employed and do hereby employ, constitute and authorize T. M. Gilmore & Co., incorporated, of Louisville, Ky., to make a contract for and on its behalf for the sale of its distillery property at Samuels Depot, in Nelson county, Kentucky, and twelve hundred and sixty-six barrels of whisky in its bonded warehouses of the manufacture of fall 1905 and spring 1906 and the future product of said distillery on the following terms and conditions, namely:..

The said twelve hundred and sixty-six barrels of whisky at the price of thirty cents per proof gallon, original gauge; the purchaser to take and pay for same not less than two hundred barrels each and every two months from the date of sale, and the cost of carriage additional after the date of sale to be added to the price. To sell two thousand barrels to be manufactured during each and every distillery season from this date, with an option to the purchaser to take and require to be made for him one thousand barrels additional each season if he required or any proportion thereof, for a period of five years from this date and the purchaser to have the privilege of renewing this contract and extending same for an additional period of five years, provided he gives notice of his intention to renew the contract on or before the first day of July next preceding the date of expiration of the first five-year period. The price of said whisky to be hereafter manufactured to be twenty-five (25c) cents per proof gallon based on corn at 45 cents per bushel in Louisville as shown by bills for same, or in the event that the price of corn should advance the price of the whisky to be increased $\frac{1}{4}$ of a cent per gallon for each cent advanced per bushel in corn above 45 cents and if corn declines the price of the whisky to be reduced $\frac{1}{4}$ of a cent per gallon

for each cent decline in the price of corn below 45 cents.   The whisky manufactured hereafter to contain 30 per cent. of small grain and to be sound and merchantable.

If, during any season the price of corn should exceed 75 cents, then no whisky is to be made except at option of purchaser, but the full amount shall be produced during the life of this contract in such amount each season as the distiller can produce, but not exceeding 3,000 barrels per season except at distillers' option.   Cooperage to be first class 8 or 10 hoop barrels, and the distiller to deliver the whisky as required f. o. b. cars at Samuels, Ky.   Outs to be guaranteed not to exceed one gallon over and above the government allowance on each barrel separately. Storage to begin first of each month following month of inspection and to be at the rate of 5 cents per barrel per month.   Goods to be paid for on the 10th of each month succeeding the month of manufacture or delivery of warehouse receipts.   Buyers to have option of having a portion of each crop made in such name or names as he may designate other than W. B. Samuels & Co., and buyer is to have the brand of W. B. Samuels placed on any or all of the whisky made under this contract, at his option.

Said W. B. Samuels & Co. is to establish and maintain a bottling room suitable for bottling in bond, suitable to meet the requirements of purchaser in bottling the whiskies of said distillery, and said bottling house must be established without delay so as to take care of any orders buyer may give for the bottling of any whiskies now in the W. B. Samuels & Co. warehouses which buyer may purchase on the market.   Purchaser is to furnish, for bottling in bond, at Samuels, Ky., all cases, bottles, corks, labels,

etc., without cost to W. B. Samuels & Co., and W. B. Samuels & Co. is to furnish labor in bottling said goods and charge for same as follows: Half pints 60 cents per case. Pints 40 cents per case. Fives 25 cents per case. Fours 25 cents per case. Also to sell the distillery plant and lands containing about 14 acres more or less at Samuels Depot, in Nelson county, Ky., being all the lands owned by said W. B. Samuels & Co., together with the distillery warehouses and all other improvements, buildings, fixtures, and machinery thereon, also all brands, good will etc,, for a consideration of $25,000.00, excluding, however, accrued storage up to time of transfer of said property, and personal property consisting of barrels, barrel material, grain, coal, etc.

The purchaser of the whisky under any contract which may be made by said T. M. Gilmore & Co., to have the option to purchase said distillery at the end of the said first five-year period, or, if contract is extended for an additional five years, then the purchaser to have the option to purchase said distillery plant and premises, at said price at end of second five-year period. Said W. B. Samuels & Co. agrees to make a deed of general warranty to the purchaser except as to the lien in favor of the United States government. Said W. B. Samuels & Co. agree to pay in the event of this sale to T. M. Gilmore & Co. a commission of fifty (50) cents per barrel on each and every barrel of whisky taken by purchaser under this contract, said commission to be paid as goods are delivered and paid for, and in the event that the purchaser in the exercise of his option takes the distillery, it is to pay a commission to T. M. Gilmore & Co. of (5) five per cent., when deed is made and notes are given or cash paid. In case distillery is destroyed

W. B. Samuels & Co. is not to be required to fulfill this contract, but in the event it should rebuild the distillery then it shall perform the contract for the remaining portion of the term. Said W. B. Samuels & Co. further agrees that in the event of the making of a contract by T. M. Gilmore & Co. as hereinbefore authorized to keep and perform said contract with the successors or assigns of person with whom same may be made. This option limited to five days from date of this paper. W. B. Samuels & Co., by M. A. Samuels, Prest.''

Acting on the authority given under this contract, T. M. Gilmore & Co., within the time limited, closed a deal with R. H. Edelen & Co., by the terms of which they purchased all the whisky and the output of the distillery with a right to buy the distillery property as set out in the authority or contract under which Gilmore & Co. was acting. W. B. Samuels & Co. was notified that this sale had been consummated, and it at once, through its president, wrote a letter to R. H. Edelen & Co., in which it refused to ratify the sale made by Gilmore & Co. on the ground that the authority for making same had not been properly executed by the W. B. Samuels Company, and that the writing signed by its president had not been approved by the board of directors. R. H. Edelen & Co. thereupon brought suit in the Nelson circuit court to compel the specific performance of the contract. A demurrer was filed to this petition, and, being sustained, plaintiff declined to plead further, and its suit was dismissed. Upon appeal here the judgment of the circuit court was affirmed, on the ground that the court would not compel the specific performance of a contract of that nature. Thereafter T. M. Gilmore & Co. filed a suit in the Nelson circuit court, wherein it

sought to recover its brokerage fees for the sale of 1,266 barrels of whisky, which were on hand at the time the sale was entered into, and the 2,000 barrels which had been manufactured by said company between the date of the execution of the contract and the filing of this suit.

W. B. Samuels & Co. answered, and, in addition to traversing the allegations of the petition, interposed the following defenses: (1) That the writing sued on was not the act and deed of W. B. Samuels & Co., and that the company was not bound by the unauthorized act of its president; (2) that at the time of the execution of this writing M. A. Samuels was not competent to contract; (3) that she was over-reached and deceived in its execution by T. M. Gilmore; and (4) that it was without consideration. In its reply, the affirmative matter in each of these several defenses set up in the answer was traversed, and plaintiff also set up the business relations theretofore existing between it and defendant, its previous employment to sell this same property, the organization of defendant and its mode of conducting business, and the circumstances under which the contract sued on was made and entered into. This affirmative matter in the reply was traversed of record, and on the issues thus made the case proceeded to trial. At the conclusion of all the testimony, the court peremptorily instructed the jury to find for the defendant, which was done, and the plaintiff's petition was dismissed. From that ruling and judgment this appeal is prosecuted.

The record discloses the following state of facts, about which there is practically no dispute: The defendant company was organized many years ago for the manufacture and sale of whisky, and W. B. Samuels, for whom it was named and who organized the

company, was its principal stockholder, chief officer, and general manager.   At his death the stock which he owned in this corporation passed under his will to his widow, M. A. Samuels, and his son, H. M. Samuels.   It appears that he owned 275 shares of stock.   M. A. Samuels, his wife, received thereof 247 shares, and H. M. Samuels, his son, 28 shares.   The only other stockholders in the company at that time were D. P. Simons, who owned three shares, and Adams, Taylor & Co., of Boston, Mass., who owned two shares.   It appears that both Simons and Adams, Taylor & Company were merely nominal stockholders; Simons being made a stockholder for the purpose of perfecting the organization, and Adams, Taylor & Co. for trade purposes, in order to advertise the output of the distillery as being their own manufacture.   M. A. Samuels, H. M. Samuels, and D. P. Simons were the board of directors of the corporation.   M. A. Samuels was its president, D. P. Simons vice president, and H. M. Samuels its secretary and treasurer, and, as such, he had the active management and control of the corporation, and looked after the conduct of its business.

After the death of W. B. Samuels, a meeting of the stockholders was held on the 25th of August, 1902, at which time the stock owned by him was formally transferred to his wife and son, and three shares were issued to D. P. Simons for the purpose of perfecting the organization.   It appears that the certificate for these three shares of stock was signed in blank by D. P. Simons and delivered to H. M. Samuels, and was thereafter kept by him in the company's safe, so that at most he was but a nominal owner of the stock.   On that same day the following order was placed upon the minute book of the company:

"On motion it is ordered that M. A. Samuels, president, and H. M. Samuels, secretary and treasurer of the incorporators above, are authorized to sign the corporate name to all papers pertaining to the business of said corporation." The business of the corporation was carried on by M. A. Samuels and H. M. Samuels. They managed, conducted, and controlled its affairs without any further meeting of the board of directors, so far as the minute book shows, until February 11, 1907, when a meeting was called for the purpose of employing counsel to defend the suit brought by plaintiff. M. A. Samuels, who executed the contract relied upon, was at the date of its execution about 65 years of age. She was in poor health, and had been for some time, was much of the time confined to her bed, and was a victim of the drug habit. She did not read the contract, but it was read over to her by T. M. Gilmore. This contract was first discussed with her son, H. M. Samuels, and he was present at the time it was read to his mother, and its various provisions discussed, and he saw her execute it.

It is further made to appear that in the summer of 1906, and some months before the execution of the contract sued on, the defendant had employed the plaintiff to sell the product of this distillery and an interest in the distillery property, and that, under said employment, plaintiff undertook to sell the property, and did find a prospective purchaser, who, for some reason, declined to close the contract, although at that time it appears both M. A. Samuels and H. M. Samuels were desirous of having it carried out. When this sale had fallen through, T. M. Gilmore, of T. M. Gilmore & Co., testifies that it was understood between him and the defendant that he would seek to

find another purchaser, and that, in furtherance of this general understanding, he continued to try and make sale of this property, or to find a purchaser for it, and did sell a part of the whisky on hand, and later, after discovering that it was possible to make a deal with R. H. Edelen & Co. that he believed would be acceptable to the defendant company, he procured the execution of the contract sued on.   This contract was  obtained  under  the  following  circumstances: John S. Kelley, a member of the firm of R. H. Edelen & Co., at the instance of T. M. Gilmore, met H. M. Samuels and T. M. Gilmore at the distillery plant, at the date upon which the contract was executed, and together discussed the proposed sale of the output and distillery plant, and their agreement and understanding was reduced to writing and later submitted to M. A. Samuels, the president of the company, who executed same as above set out.   It appears that the price agreed upon as commission for the sale of the whisky on hand, and the annual output was the usual and customary brokerage fee for conducting such sales.

When reduced to their last analyses, the defenses interposed by the defendant are two:   First, that the contract sued on is an entirety and not severable, and that, as neither the president nor the president and secretary and treasurer had authority to sell and dispose of the distillery property, the contract into which they entered with plaintiff, by which they authorized its sale, together with the sale of the whisky on hand and the annual output of the distillery for five years, is void; and, second, that at the date of its execution the mind of M. A. Samuels, the president of the company, was so weakened and enfeebled by the continued and protracted use of morphine that she did

not know and understand what she was doing, and that for this reason the company is not liable or bound upon the contract. The other defenses interposed are wholly without merit, for there is nothing in the record to justify the charge that a fraud was practiced upon the president, M. A. Samuels, in the execution of the contract, and the undertaking on the part of a broker to effect a sale of property has so frequently been held to be a consideration sufficient to support the contract, as evidenced by the following authorities: Cook v. Fryer, 3 Ky. Law Rep. 612; Jacob v. Buchanan & Bros., 11 Ky. Law Rep. 861; Simrall v. Arthur, 13 Ky. Law Rep. 682; Tamplet & Washburn v. Saffell, 15 Ky. Law Rep. 94—that the defense of want of consideration cannot be seriously considered.

We will first dispose of the question as to whether or not this is a severable contract, and, for the purposes of this case, we will proceed upon the theory (without so deciding) that the president of a company, even though advised and counseled by the secretary and treasurer, who is also a member of its board of directors, has no authority to sell and dispose of the real estate owned by the corporation in the absence of express authority from the board of directors so to do, when the business of the corporation is not that of buying and selling real estate. Here the president of the company undertook, through the plaintiff, to sell the whisky on hand, together with such whisky as should be manufactured during the next five years, and the distillery property itself. The business of this corporation was the manufacture and sale of whisky. It can hardly be seriously questioned, in the absence of any express authority from the board so to do, that the president or

the secretary and treasurer, having the active management of the company, had the right to sell whisky on hand, and such as it should from time to time manufacture, as this was the business in which the corporation was engaged. But, when we find that the board of directors had expressly authorized the president and the secretary and treasurer to do such acts as were necessary to the proper and successful conduct of the company's business, we must conclude that in the execution of the contract sued on, in so far as it authorized and directed a sale of the whisky on hand, and such as should be manufactured during the time specified in the contract, the president was acting clearly within the express authority given by the board of directors.

We have, then, a contract, a part of which is authorized by the board of directors, and which, therefore, the president had a right to execute, and a part of which, as stated, for the purpose of this case only, she had no right to execute. Are these so connected and interwoven as that they must be treated as a whole, or may this contract be separated into its component parts and such as were authorized carried into effect? It is not always an easy matter to determine just what contracts are severable, and what are not. The text-writers and authorities agree that in determining whether a contract shall be treated as severable or as an entirety the intention of the parties will control, and this intention must be determined by a fair construction of the terms and provisions of the contract itself. In 3 Page on Contracts, Sec. 1484, we find the rule thus stated: "In determining whether a contract is entire or severable, the intention of the parties is paramount, and, if this intention is clearly expressed, no question can arise as to which class of

contract it is.   This intention is, however, often not
clearly expressed, as the parties have generally no
clear idea whether the contract is entire or severable,
and no definite idea of the legal consequences which
would follow from its being in either class.   The in-
tention of the parties must therefore be deduced from
the language used by the application of the ordinary
rules of construction.   The rules of construction are
applied differently, however, in the different classes
of cases in which the question whether the contract
is entire or severable may arise.   If this question
arises in connection with the illegality of one coven-
ant, the general principle applies that the courts will
uphold a contract, if, by fair construction, it is pos-
sible to do so, rather than overthrow it.   Accordingly
the test chiefly relied upon in such cases is whether
the parties have apportioned the consideration on the
one side to the different covenants on the other, one
of which covenants is illegal.   If the consideration is
apportioned so that for each covenant there is a cor-
responding consideration, the contract is severable,
and the illegality of one covenant does not make the
rest unenforceable.   If, on the other hand, the con-
sideration is not apportioned, and the same considera-
tion supports a legal and illegal covenant, the con-
tract is entire, and is already unenforceable.''

On the question of apportionment of the considera-
tion, we find in the same authority, under section
1486, the following: ''In determining questions of
performance, the fact that several covenants are each
supported by a distinct consideration, which consider-
ation is thus separately apportioned, is often enough
to show that the covenants are severable.''   In 2
Parsons on Contracts (9th Ed.) p. 517, we find the
rule stated in this manner: ''The question whether a

contract is entire or separable is often of great importance. Any contract may consist of many parts; and these may be considered as parts of one whole, or as so many distinct contracts entered into at one time, and expressed in the same instrument, but not thereby made one contract. No precise rule can be. given by which this question in a given case may be settled. Like most other questions of construction, it depends upon the intention of the parties, and this must be discovered in each case by considering the language employed and the subject-matter of the contract. If the part to be performed by one party consists of several distinct and separate items, and the price to be paid by the other is apportioned to each item to be performed, or is left to be implied by law, such a contract will generally be held to be severable. And the same rule holds where the price to be paid is clearly and distinctly apportioned to different parts of what is to be performed, although the latter is in its nature single and entire.''

In Story on Contracts (5th Ed.) p. 28, the author thus states the rule: ''The weight of opinion and the more reasonable rule would seem to be that where there is a purchase of different articles, at different prices, at the same time, the contract would be several as to each article, unless the taking of the whole was rendered essential either by the nature of the subject-matter, or by the act of the parties.'' Our court has in many instances, viz., Craddock v. Aldridge, 5 Ky. 15; Allen v. Sanders, 46 Ky. 593; Berryman v. Hewit, 29 Ky. 462; C. & O. R. R. Co. v Shelby-ville, B. & O. R. Co., 117 Ky. 95, 77 S. W. 690, 25 Ky. Law Rep. 1265, been called upon to construe contracts where the issue was made to turn on the question as to whether they were severable or not, and it has uni-

formly been held that, where the plain language of
the contract did not force a contrary construction, the
contract has been held severable in order that the
intention of the parties might be carried out as far
as possible.

In the case of Craddock v. Aldridge, supra, Ald-
ridge contracted with Craddock to build a house for
a certain sum of money, to be completed at a certain
time. One-fourth of this money was to be paid
when the work was begun, one-fourth when the roof
was finished, and the remainder when the house was
completed. It was held that this was a severable
contract. Again, in Allen v. Sanders, supra, where
the plaintiff agreed to build a house for the defend-
ant by a specified time, and defendant agreed to pay
$50 in cash and the balance when the work was com-
pleted, it was held that there was a severable con-
tract, and the covenant calling for the payment of
$50 in cash could be enforced. See, also, Leonard v.
Dyer, 26 Conn. 172, 68 Am. Dec. 382; Patton v. Gil-
mer, 42 Ala. 548, 94 Am. Dec. 665; Mechanics' Nat.
Bank v. Frazer, 86 Ill. 133, 29 Am. Rep. 20; Scott v.
Kittanning Coal Co., 89 Pa. 231; Pierson v. Crooks,
115 N. Y. 539, 22 N. E. 349, 12 Am. St. Rep. 831;
Coleman v. Insurance Co., 49 Ohio St. 310, 31 N. E.
279, 16 L. R. A. 174, 34 Am. St. Rep. 565.

Applying these general principles to the contract
under consideration, we find that it is expressly
agreed that the plaintiff shall receive from the de-
fendant 50 cents per barrel for each barrel of whisky
which it sold for the defendant, and that, in the
event the purchaser of the whisky exercises the option
given to purchase the real estate, then the plaintiff
shall receive for his compensation for effecting this
sale 5 per cent. of the gross sum realized from the

sale of the real estate.    His compensation for the sale of the whisky is in no wise made to depend on the sale of the real estate.    Suppose, for instance, that the contract had been closed by the defendant, and that it had accepted the terms of the sale to Edelen & Co., and Edelen & Co. had received the whisky which the defendant had on hand when the contract was made, and had annually thereafter received the whisky as it was manufactured, and then at the end of five years had declined to exercise its right and close the option to purchase the real estate, could the defendant be heard to say that it would not pay to the plaintiff the commissions called for in the contract for the sale of the whisky?    We think not.    Then, as the sale of the whisky was in no wise made dependent upon the sale of the real estate, it seems very clear that the parties, when entering into this contract, did not intend that the plaintiff's compensation for the sale of the whisky would be made in any wise to depend upon his ultimate sale of the real esate.    In fact, from the plain language of the contract, it is apparent that they each understood that the commissions for the sale of the whisky were due and payable when the terms of the sale thereof were complied with, to wit, the whisky delivered and paid for; whereas, it could not be determined whether the plaintiff would under this contract be entitled to any commission on the sale of the real estate until the expiration of five years from the date of the contract and Edelen & Co. had made it known whether or not they would exercise their option and take the property.

Thus, by the provisions of the writing sued on, the plaintiff was authorized to sell the whisky which the defendant company at that time owned and should

manufacture during the next five years at the prices agreed upon in the contract, and, if he succeeded in doing so, he should be paid 50 cents per barrel for his services. There can be no doubt whatever that the parties themselves clearly understood that the sale of the whisky under this contract was not dependent upon the sale of the real estate, and that the purchaser of the whisky under this contract was in no wise compelled or required to purchase the real estate in order to enable him to close the contract for the purchase of the whisky. We think the contract is a severable contract, and that portion thereof which the plaintiff company was authorized to make should be carried out and complied with by defendant, unless it be found that defendant should be excused from its performance because at the time the contract was executed its president was not competent to know and understand its terms, and was not capable of making a contract for which the defendant company should be held answerable.

This raises a novel question. The defense of want of capacity has frequently been interposed by individuals in seeking to escape liability upon contracts into which they have entered, but we are cited to no case where a corporation has sought to be excused from performing its contract upon the sole ground that its representative who made the contract for it did not have sufficient mental capacity to know and understand the character and effect of the transaction. This lack of precedent is due, perhaps, to the fact that a corporation enjoys many advantages which the individual does not. It is an artificial being whose affairs are in general not affected by the sickness, mental derangement, or death of one of its officers. The law requires that its business shall be

under the management and control of certain officials, and, in the event of the disability of any one of these to act, provision is made that others in line of succession shall discharge the duties of those thus incapacitated. The duties which are usually discharged by the president in case of disability properly fall upon the vice president, and, if he should likewise be under some disability, then upon the secretary, treasurer, or other officer as the law designates, for in contemplation of law the incapacity, death, or removal from office of one official does not break the continuity in the chain of the conduct of the company's business. Still the company in every transaction must act through some one, and, if it shall be made to appear that the officer or agent representing it was at the time of the transaction complained of so lacking in mentality that he could not enter into a contract for himself, we can see no good reason why it should be held that the company for which he attempts to act should not be excused upon the same ground.

But, in order that it may avail itself of this right, it must be clearly established that the said contracting agent did not, at the time the contract was entered into, have sufficient capacity to know and understand what he was doing, and that this fact was not known to other officers or agents of the company, or, if known to them, they did not know that such officer was attempting to act for or represent the company. It is not enough to show that such contracting agent was, by the use of drugs, disease, or from other cause, at times lacking in mentality, but the evidence of the defective mind must relate immediately to the time when the transaction complained of was being entered into.

In this case the defendant has utterly failed to establish either of the points necessary to enable it to escape liability under its contract; for, while it is shown that Mrs. Samuels had for many years been addicted to the use of morphine, and was in poor health at the time of the execution of this contract, and her physician testifies that her mentality had by reason thereof been very much weakened, she has by her own testimony given in this case shown that upon the day of the transaction complained of she knew and understood what she was doing. Her deposition was not given until many months after the date of the contract, and yet she remembers perfectly well the whole transaction, and how she was called to the telephone by her son and notified that he wanted to bring the plaintiff's representative out to see her, to which arrangement she finally consented. She details the order in which they came into the house, what was said and done by each, what her physical condition was on that day, with what she was suffering, and how many doses of morphine she had taken and how much at a dose. She shows plainly in her deposition that she then understood that she was giving an option upon the whisky on hand, the plant and its output, which was satisfactory to her son, and she says, and it is shown in the record, that she relied upon his judgment in a large measure, if not exclusively, in the conduct of their business. In the light of this testimony on her part, in spite of the opinion of her physician and others who have testified that she did not, we are constrained to believe that she did know and understand what she was doing at the time she signed the contract in question.

But even if the evidence led us to entertain a contrary view, and to hold that she did not at that time

have mental capacity to contract, still defendant must fail in its contention for the further reason that in its execution the secretary and treasurer of the company, who was also a director and had the active management and control of its affairs, participated. In fact, he assisted in the draft of the contract and discussed its terms and provisions, and not until they were acceptable to him was his mother, the president, conferred with in regard thereto. Here, then, we have a contract entered into between plaintiff and defendant in which the defendant is represented not only by the president, whose capacity to contract is questioned, but by another officer of the company, her son, H. M. Samuels, who had equal authority to represent it and whose mental ability is in no wise impaired. He and his mother owned practically all of the stock of this corporation. In its welfare and success he was most vitally interested. If he had not wanted the contract executed, or the company had not been satisfied with its terms and provisions, instead of going to his mother and requesting her to enter into it for the company, he should have objected to her signing it; and, if he regarded her as mentally incompetent to transact business, he should have so stated to the plaintiff.

The fact that he did not object to plaintiff seeing his mother and discussing the matter with her and contracting with her relative thereto is another evidence that he did not regard his mother as incompetent to transact business, and that neither they nor their attorney so regarded her is further evidenced by the fact that when, a few days after the contract had been entered into, the company through its president notified Edelen & Co. that they would not carry out the contract, the ground upon which they sought

to escape liability was not want of capacity upon the part of its president, who made the contract, but because she had not first obtained authority so to do from the board of directors.

The contract being a severable one, and there being no merit in the contention of appellee that in the execution of the contract it was not properly represented, the record discloses no defense whatever to plaintiff's suit, and, this being made to appear, a peremptory instruction should have been given the jury to find in favor of plaintiff, under the terms of the contract, 50 cents per barrel for each barrel of whisky on hand at the date of its execution and such as was manufactured during the succeeding year.

The judgment of the lower court is therefore reversed, and the case remanded for further proceedings consistent herewith.