MANUFACTURERS TRUST COMPANY, ET ALS., PLAIN-TIFFS-RESPONDENTS, v. RUBIN PODVIN AND GUSSIE PODVIN, ET ALS., DEFENDANTS-RESPONDENTS.

Argued June 2, 1952—Decided June 26, 1952.

*Mr. Frederic W. Schumann* argued the cause for respondents, cross-appellants (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys).

*Mr. Joseph B. Perskie* argued the cause for appellants, Rubin Podvin and Gussie Podvin (*Messrs. Perskie & Perskie,* attorneys).

*Mr. Eugene N. Harris* argued the cause for appellant, The Boardwalk National Bank of Atlantic City (*Messrs. Kirkman, Mulligan & Harris,* attorneys).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   We certified of our own motion these appeals and cross-appeals to the Appellate Division from a judgment entered in the Chancery Division. The trial judge filed two opinions, reported at 14 *N. J. Super.* 470 and 15 *N. J. Super.* 398.

On August 3, 1949, Salvatore Zingale was hospitalized in Brooklyn, New York, for a long standing mental ailment and on October 8, 1949, the New York Supreme Court adjudicated him a mental incompetent and appointed plaintiff Manufacturers Trust Company as the committee of his person and property.   Plaintiff Mary Zingale, his wife, was appointed his guardian in the instant action.

On July 22, 1949, 12 days before his commitment, Zingale acquired the Hotel Davenport in Atlantic City from defendants Rubin and Gussie Podvin, taking title in the name of Salvatore Zingale, Inc., a corporation of this State organized for the purpose.   Zingale held all of the outstanding stock of the corporation except two qualifying shares issued to his co-directors, Benjamin A. Rimm, an attorney, who organized the corporation, and Mr. Rimm's secretary.   Zingale was named as president and chairman of the board.

The judgment on appeal, in pertinent parts, (1) set aside the sale of the hotel and nullified the deed and various bonds and mortgages and notes delivered in part payment of the purchase price.   The instruments nullified included a promissory note of the corporation for $24,000 personally endorsed by Zingale, and a bond and mortgage of that amount, given to defendant, the Boardwalk National Bank of Atlantic City; these had replaced a bond and mortgage of the Podvins held by the bank, which, in the amount of $20,962.61, was ordered reinstated; (2) entered judgment in favor of plaintiffs against the Podvins in the sum of $15,338.90, representing cash paid by Zingale; (3) granted plaintiffs a lien upon the hotel in the sum of the judgment, subject, however, to the prior lien of the reinstated mortgage held by the

bank; (5) directed the plaintiffs to pay Mr. Rimm his charge of $400 for legal services in the transaction.

The appeals of the bank and of the Podvins challenge the provisions of the judgment setting aside the transaction, and the Podvins also challenge the personal judgment against Mrs. Podvin. The plaintiffs' appeals complain of the refusal of the trial court to enter personal judgment for $19,338.90, instead of $15,338.90, of the subordination of the lien of their judgment to the lien of the reinstated mortgage of the bank, and of the direction to pay Mr. Rimm the sum of $400.

Zingale is a cobbler by trade and was born in Italy. He speaks broken English but is unable to read or write English. He worked as a cobbler until 1942 when he started to sell novelty jewelry and simulated pearls from a small shop in Brooklyn, New York. His history of mental illness dates back to 1936. He was first hospitalized in 1945 and thereafter, until his final adjudication, underwent almost continuous treatments either as an ambulatory patient or in institutions, but without result. The uncontradicted medical testimony is that he was clearly mentally irresponsible from and after 1945 and utterly devoid of judgment or understanding of the meaning and effect of his acts in the instant transaction. His conduct however did not always betray his infirmity. The testimony of the several persons who dealt with him in the matter is in accord that his conduct invariably appeared normal to them and that they saw no evidences that he did not know what he was doing.

Defendant Rubin Podvin did not meet Zingale until some time in May, 1949. However, 15 months earlier Zingale, while on vacation in Atlantic City, in some manner met one Saslaff, a real estate broker with whom the Podvins had listed the hotel for sale. On February 2, 1948, Zingale signed a contract to purchase the hotel for $54,000 cash, and paid $4,000 deposit. On the same day he executed an application to defendant bank for a mortgage loan of $25,000, which the bank, by a 30-day letter commitment dated

February 11, 1948, approved for $22,000 after investigation of his credit rating at a New York bank where Zingale maintained a savings account. Meanwhile, however, Zingale had been committed on February 7 to a sanatorium on Long Island where he remained until March 13 undergoing electric shock treatments. His wife and son consulted New York attorneys who on February 20, 1948, wrote Saslaff and on February 27 wrote the bank advising of Zingale's mental incompetency and confinement and demanding that Saslaff return the $4,000 deposit.

Saslaff forwarded the letter to defendant Rubin Podvin in Florida. Podvin sent it to Clarence Blitz, his attorney, with a letter stating that it appeared to him that Zingale "wants to back out from the deal. * * * So please look for any loopholes." After writing the New York attorneys that Podvin had never seen Zingale and so knew nothing of his mental incapacity, Mr. Blitz prepared deeds and other instruments necessary to complete the transaction, had the Podvins execute them, and upon the closing date, March 2, 1948, attended at the place of closing and declared the $4,000 forfeited when Zingale, then in the sanatorium, did not appear.

The letter addressed to the bank was received by the assistant cashier, Mr. Drumm, and was not brought by him to the attention of any other bank officer. It was attached by Drumm to the application for loan and upon the expiration after 30 days of the life of the commitment was transferred with the application to the inactive files where it remained, forgotten until this suit was brought.

The Podvins invested additional money in improvements to the hotel and in May, 1949, were operating it. After his release from the sanatorium in March, 1948, Zingale continued receiving electric shock treatments from time to time but was not again confined in any institution until his final commitment in August, 1949. However, his two treating physicians examined him in March, 1949, and testified that at that time he was wholly irresponsible and had evidenced no improvement. During that month Zingale and his wife

retained Mr. Rimm, who practiced in Atlantic City, to recover the $4,000 deposited on the 1948 transaction. Zingale's condition was made known to Mr. Rimm who was shown papers executed by Zingale's physicians evidencing his condition. Just how Mr. Rimm's employment was converted to an employment for the purchase of the hotel does not appear. Mr. Rimm's testimony was not taken at the trial because of his serious illness.

Mr. Podvin, however, testified that in May, 1949, Zingale and a lady, who Podvin said was Zingale's sister, came to him in the hotel restaurant and broached the matter of reviving the sale. Negotiations ensued culminating in the preparation of a contract by the realtor Saslaff calling for the sale of the hotel to Zingale "or his nominee" for $60,-600. Zingale applied to defendant bank for a mortgage loan of $25,000, which the bank, without a credit investigation or check upon its earlier files, approved in the amount of $24,000, provided the balance of the purchase price was paid in cash. Podvin sent the contract drafted by Saslaff to Mr. Blitz for examination. Mr. Blitz testified that this was the first time I knew the deal was revived." Subsequently Mr. Rimm telephoned Mr. Blitz "that he was forming a corporation to be known as Salvatore Zingale, Incorporated, and that Salvatore Zingale, Incorporated, would be the person who would be the buyer of the Davenport Hotel and the fixtures." Mr. Blitz undertook to prepare a contract naming the corporation as buyer. It then developed that Zingale could not meet the condition imposed by the bank that the balance of the purchase price above the mortgage be paid in cash. Zingale seems to have lacked about $22,000 of the required amount. More negotiations followed. Finally the Podvins agreed to have the amount made up by a credit to Zingale of the $4,000 paid on the earlier transaction, by taking a second purchase money bond and mortgage of $8,000, and by leasing back the hotel for the 1949 summer season and the restaurant for three seasons, crediting the stipulated $10,000 rental upon the purchase price. The

bank was then asked to revise its commitment agreement upon the basis of the new contract. The president and vice-president agreed to do so but only upon condition that the mortgage to the bank mature one year from its date rather than four years as provided in the original commitment. And the bank agreed to accept the corporation as mortgagor only after Zingale personally guaranteed the obligation.

The closing was held on July 22, 1949. There were numerous adjustments of one kind or another to be made. The charges against Zingale exceeded the credits to him and he found himself once again without enough cash. This time the shortage was almost $1,000. The Podvins again gave way and accepted the corporation's unsecured $1,000 60-day note to cover the deficiency.

In the end Zingale had his hotel after parting with cash of more than $19,000 in the two transactions and taking on obligations in the first year of some $30,000 for principal and interest on the notes and mortgages, taxes and insurance. But during that year the hotel was to produce not one penny to help him meet these heavy demands because he had leased it back to the Podvins for the 1949 summer season. And he was utterly without other resources from which to pay them, as should have been apparent to the bank and the Podvins after his difficulty in paying even the closing adjustments.

The settled rule of law is that "contracts with lunatics and insane persons are invalid, subject to the qualification that a contract made in good faith with a lunatic, for a full consideration, which has been executed without knowledge of the insanity, or such information as would lead a prudent person to the belief of the incapacity, will be sustained." *Drake v. Crowell*, 40 *N. J. L.* 58 (*Sup. Ct.* 1878); and "absence of knowledge of the insanity of the party, as well as fairness in other respects, must concur to give validity to a contract with a lunatic. Knowledge or information, such as would lead a prudent person to the belief of the

incapacity, is such evidence of bad faith as will avoid the contract." *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r., 38 N. J. L. 536 (E. & A. 1876).*

The Podvins and the bank concede the general rule but deny its applicability, contending that the transaction was not with the lunatic but with the corporation. Alternatively, they urge that in any event they are not to be charged with knowledge of Zingale's incompetency, the transaction was fair, and the exception to the rule applies.

██ The transaction was only in form with the corporation. In actual fact it was with Zingale personally and this was fully understood by both the bank and the Podvins. The agreement which Mr. Blitz revised called for a conveyance to Zingale "or his nominee." The corporation was organized later and was substituted as the contracting party with the obvious understanding by the bank and the Podvins that it was merely Zingale's nominee. The corporation had no assets whatever—it was an empty shell. The cash was Zingale's. The bank accepted the corporation as mortgagor only when Zingale personally endorsed the mortgage note. So, as Zingale himself, during his insanity, could not personally make a valid agreement, his corporate nominee in virtue of a derivative authority could not do an act for him which he could not lawfully do for himself, "* * * transactions of third parties, which, under the circumstances, would be invalid if had directly with the principal, must be equally invalid though they be done with the agent." *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r., supra, p.* 546.

Thus, that the transaction was in form with the corporation may be wholly disregarded and we need not deal with the argument of the bank and the Podvins that the doctrine of piercing the corporate veil may be applied only when to prevent fraud it is necessary to hold liable individuals who form the corporation, and never is applied for the benefit of him who created the corporation. Nor is it necessary to consider whether, as Zingale was the corporation, the entity

would in any event be excusable upon the ground of his incapacity because if he could not enter into a contract for himself, he as the only officer with authority to do so could not make one for the corporation. See *T. M. Gilmore & Co. v. W. B. Samuels & Co.*, 135 *Ky.* 706, 123 *S. W.* 271 (*Ct. App.* 1909), 13 *Am. Jur., Corporations, sec.* 1109, *pp.* 1034–1035. The court below properly dealt with the transaction as the parties themselves did, as a transaction between the lunatic and the defendants.

■ The contention that the transaction was fair is open to serious question. However, upon the premise that it was fair, it was nevertheless invalid in light of the information possessed by both the bank and the Podvins which, at the least, was plainly such as would lead a prudent person to the belief of Zingale's incapacity.

■ The bank's files contained the 1948 letter from the New York attorneys. The files were kept in the same building where all the officers who dealt with Zingale in both years had their offices. Mr. Drumm, the assistant cashier, and Mr. Fiedler, a vice-president, played parts in the processing of both applications. Mr. Drumm had forgotten the letter. True, Mr. Fiedler, the president, Mr. Kirkman, and the executive vice-president, Mr. Boyer, did not know of its existence. The test, however, is whether the bank had information sufficient to alert it of Zingale's insanity. The letter was such information. Clearly the circumstances of this case require the application of the general rule that a corporation is charged with notice of the contents of its own records. 3 *Fletcher, Cyc. of Corporations* (1947), *sec.* 801. A routine check of the bank's files would have disclosed the letter and have avoided the difficulty now confronting the bank. The bank is hardly to be excused because it did not make the check.

The Podvins take the position that the letter received by Saslaff was insufficient in law as information which would lead a prudent person to the belief of Zingale's incapacity. They make no claim that they had forgotten the letter.

Their contention is utterly without merit. Indeed, after the receipt of the letter and before the forfeiture was declared, Saslaff, as Podvin's agent, visited Zingale's wife and son in New York to discuss Zingale's ailment and sought unsuccessfully to find out the name of the institution where he was.

It is plain that the trial court rightly set aside the sale as governed by the general rule invalidating transactions with lunatics. We think, however, that the court erred upon other aspects of the relief allowed.

Plaintiffs were clearly entitled to have the personal money judgment include the $4,000 deposit paid in 1948. The trial court adjudged that the Podvins could retain that sum because it was paid before the receipt of the letter from the New York attorneys. This was error. Mere want of knowledge of incapacity or of information leading to a belief thereof does not make a transaction with a lunatic valid. Contracts for necessaries are exceptions to the general rule unless imposition in addition to knowledge is proved; but the instant transaction is not of that class. The Podvins could retain the $4,000 only if it appeared that Zingale received and enjoyed an actual benefit from the contract. Zingale's execution of the 1948 purchase contract was a wholly void act which created no obligation whatever upon him. *Hillsdale National Bank v. Sansone,* 11 *N. J. Super.* 390 (*App. Div.* 1951). The indispensable element of a voluntary assent to the contractual terms cannot exist as to the attempted undertakings of a lunatic. See *Story, Prom. Notes,* 107, sec. 101.

"Other contracts with lunatics not strictly for necessaries, which have been fully executed, and on which a consideration of benefit to the lunatic has been given, may be within the reason of this exception [as to necessaries], where the transaction is shown to be perfectly fair and reasonable, at least, so far as to allow the recovery back of the consideration given, or to prevent a rescission by the lunatic or his representatives, without restoring the consideration, whenever a restoration is practicable." *Matthiessen & Weichers Refining Co. v. McMahon's Adm'r., supra, pp.* 543-544.

Liability is thus not founded upon contract but because of benefit received. But Zingale received no consideration of benefit to him from the Podvins under the 1948 contract. And the Podvins did nothing whatever to their detriment in reliance upon Zingale's execution of the instrument. The agreement was still executory when Saslaff sent them the New York attorneys' letter. Thereafter their only action was to hasten to have documents prepared to put them in a position to declare the forfeiture on the closing date.

█ The judgment as augmented cannot stand, however, against Gussie Podvin on the proofs presently in the record. Title to the hotel was in her husband's name individually and she appears to have joined in the contracts only to convey her inchoate right of dower. Whether she received any part of the moneys paid by Zingale does not appear. The judgment as to her will be vacated and the cause will be remanded for further proceedings to determine what sums, if any, she received, and to enter a new judgment accordingly.

█ To the extent of the cash paid by Zingale in the 1949 transaction, that is, $15,338.90, plaintiffs are entitled to have the judgment made a lien upon the hotel prior to the lien of the bank's reinstated mortgage. Effectively to give Zingale the mantle of protection with which the law strives to cloak every lunatic requires the giving to his representative of every security for the return of his money which the circumstances justly permit. Here, granting that the bank's officers had no actual knowledge of Zingale's condition and can in no way be charged with imposition upon or conscious advantage taken of him, nonetheless the bank cannot escape a full share of responsibility for the course of events. It would not advance, but would defeat, equity in the circumstances to put the bank in a position to wipe out the security of the judgment lien through foreclosure of its reinstated mortgage. Zingale's insanity made him helpless to avoid his predicament. But the bank, if innocent of imposition, had the information in its files which,

sought out and acted upon, would have prevented the predicament. The strong policy of the law to protect the lunatic would lose much of its force in this case if the bank, which must share the responsibility for the event, were allowed to be in a position to destroy a valuable security for the complete recovery of his money. The subordination of the lien of the mortgage to the lien of the judgment does not put the bank in a comparable position in relation to the plaintiffs. It is far better able to protect the lien of the mortgage in a subordinated status. And there is ample value in the property to encourage the bank to do so. The bank's two expert witnesses as to value agreed that the property was fairly priced at $60,674 in the sales contract. Even the two experts for plaintiffs testified to values of $45,000 and $50,900, respectively.

The bank was not, however, in any way concerned with the $4,000 payment by Zingale to the Podvins in 1948. Its reinstated mortgage shall therefore be a lien prior to the lien of that amount of the augmented judgment.

Finally the trial court erred in directing plaintiffs to pay Mr. Rimm for his services in the transaction. Plaintiffs agreed in the pretrial order to waive formal proof that the services had a value of $400, but Mr. Rimm was obliged to prove what the services were. Such proof was not forthcoming at the trial because, as mentioned, Mr. Rimm was too ill to testify. After the trial he submitted an affidavit of services, but its contents cannot support the judgment as the plaintiffs never agreed to its use in lieu of testimony. Moreover, in the circumstances presented, Mr. Rimm's claim, also, was actionable only if it was established that the services he rendered were beneficial to the lunatic. There can be no doubt that he must be charged with knowledge of Zingale's condition. It was on the basis of that condition that he was retained to recover the $4,000 deposit, and he was supplied with the proof of that condition in the form of the doctors' statements. It can scarcely be contended in light of the result we have reached that Mr. Rimm's services

were beneficial to the lunatic. Too, the trial court seems to have overlooked the concession by Mr. Rimm's attorney during the trial that "Mr. Rimm will not be entitled to a penny unless your Honor upholds the transaction and Mr. Rimm will not be given the fee unless you uphold the transaction."

The judgment is modified: (1) to vacate the personal judgment against Gussie Podvin and to remand the cause for a new determination of her liability, if any, and to enter judgment as to her accordingly, the relation of the lien of such judgment, if any, against her, to the lien of the reinstated mortgage of defendant, the Boardwalk National Bank of Atlantic City, to be the same as that of the judgment against the defendant Rubin Podvin; (2) to increase the personal judgment against defendant Rubin Podvin from $15,338.90 to $19,338.90; (3) to give plaintiffs a lien upon the hotel for $15,338.90 of the augmented personal judgment against defendant Rubin Podvin prior to the lien of the defendant's, the Boardwalk National Bank of Atlantic City, reinstated mortgage; (4) to give plaintiffs a lien upon the hotel for $4,000 of the augmented personal judgment against the defendant Rubin Podvin, subject to the lien of said bank's reinstated mortgage; (5) to reverse the judgment in favor of defendant Benjamin A. Rimm against plaintiffs. Costs to plaintiffs.

HEHER, J. (dissenting in part). I dissent from the modification of the judgment to render the reinstated mortgage of the Boardwalk National Bank on the hotel property subject to the lien of plaintiffs' judgment for the money paid by the incompetent in consummation of the sale.

I know of no principle of the moral jurisdiction of equity to adjudicate the civil rights and regulate the jural relations of individuals that demands this surrender of the priority of the bank's lien under the preexisting mortgage for the moneys due at the time of the conveyance to Zingale. The subordination of its lien is not justified as a measure to deprive the bank of an advantage obtained in the trans-

action which in equity and good conscience it ought not to retain.

The judgment proceeds on the hypothesis of the bank's good faith; and rightly so, for there is no showing of fraud or bad faith. It is said that "the mantle of protection with which the law strives to cloak every lunatic requires the giving to his representative of every security for the return of his money which the circumstances justly permit," and that even though the bank "had no actual knowledge" of the incompetent's condition and cannot be charged "with imposition upon or conscious advantage taken of him, nonetheless the bank cannot escape a full share of responsibility for the course of events," and the right of foreclosure of its reinstated mortgage cannot be allowed "to destroy a valuable security for the complete recovery" of the incompetent's money. This is predicated upon the finding that the incompetent's "insanity made him helpless to avoid his predicament," and the bank "had the information in its file which, sought out and acted upon, would have prevented the predicament." But this theory lays upon the bank the penalty of a forfeiture of its priority of lien for moneys long since advanced on the faith of the mortgage, even though it acted in complete good faith and without actual knowledge of Zingale's incompetency. The bank is thereby deprived, not of an advantage it had obtained in the transaction at issue, but of its priority of lien for the moneys loaned to the prior owner on the security of the lands. I am aware of no consideration of equity or justice which demands that the bank forego its priority of lien to insure the recovery of the incompetent's money, and thus to contribute to the recovery if the security does not yield sufficient to satisfy both liens, merely because it aided in the consummation of the transaction by a mortgage loan and its officers had failed to examine the files relating to a prior application for a loan made by Zingale.

As to the claim of the attorney for professional services, I am in accord with the result.

I concur in the opinion otherwise.

Mr. Justice BURLING and Mr. Justice JACOBS join in this dissent.

HEHER, BURLING and JACOBS, JJ., concurring in part.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*Opposed*—None.